# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

========================

## ON MOTION FOR REHEARING

========================

## NO. 03-03-00505-CR

**Kevin Wayne LaFitte, Appellant**

**v.**

**The State of Texas, Appellee**

## FROM THE DISTRICT COURT OF TRAVIS COUNTY, 390TH JUDICIAL DISTRICT
## NO. 9020409, HONORABLE CHARLES F. CAMPBELL, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Our opinion and judgment of November 18, 2004 are withdrawn and the following substituted therefor.

Appellant Kevin Wayne LaFitte was convicted of capital murder. *See* Tex. Pen. Code Ann. § 19.03(a)(2) (West Supp. 2004-05). In this case, we will review the trial court's decision to admit into evidence appellant's videotaped statements allegedly made after he invoked his right to remain silent and to consult with an attorney. We will also consider whether hearsay statements made by third parties and introduced by the State against appellant are admissible as statements against the declarant's penal interests. For the reasons stated below, we affirm the judgment of conviction.

# BACKGROUND

On October 20, 2001, Jeffrey Burns was shot and killed. Burns was a known drug dealer who trafficked in large amounts of marihuana. He lived in South Carolina and traveled frequently to Austin. On these trips, he would visit a small circle of friends who acted as suppliers for him, and he would carry large amounts of cash to make his purchases. On this occasion, Burns came to Austin intending to purchase about 200 pounds of marihuana and carried approximately $70,000 in cash. During this visit, Burns was stying with a friend, Christopher Marschner.

On the night of his death, Burns told Marschner that appellant had located marihuana for him to purchase from appellant. Burns asked Marschner to go with him to appellant's house to make the purchase, but Marschner declined. Instead, Marschner gave Burns directions, and Burns proceeded on his own at about 8:30 that evening. He took $42,000 in cash with him. Marschner had one last contact with Burns when he received a telephone call from him asking for directions. By 10:00 p.m., Burns had not returned to meet Marschner. At about the same time, Burns's body was found behind his car in the parking lot of Bull Creek Park.[1] He had died from multiple gunshot wounds. Crime scene investigators found on Burns's car palm and fingerprints that later were found to match those of appellant.

On October 21, appellant gave a $200 gift card and another $200 in cash to his friend Latrice McDuffie. He also signed nine money orders totaling $4,500. Anthony Dankworth, appellant's brother-in-law, told one of his friends that he had received $25,000 from someone. Dankworth's brother later gave that friend $25,000 in cash, asking him to hold the cash for

---

[1] Neighbors in the area had reported hearing gunshots coming from the park at around 9:41.

Dankworth.  In the next few days, Dankworth also paid off several loans.  Evidence in the record also establishes that appellant is legally blind and that Dankworth frequently drives him around Austin.

Believing appellant to be a witness to the homicide, Austin Police Department homicide detective Detective Eric De Los Santos questioned him for three hours on October 21, after which appellant returned home.  De Los Santos interviewed him again on October 24 and made a videotape of the questioning.  De Los Santos testified that because he then believed appellant might have been involved with Burns's homicide, he read appellant his *Miranda* rights.  *See Miranda v. Arizona*, 384 U.S. 436 (1966).  Appellant related a version of events of the evening of October 20 different from that he gave at his previous interview.  During the second interview, appellant stated that he was at a point where he thought he needed to talk to a lawyer and that he wanted to return home.  De Los Santos responded, "Okay, that's fine."  As De Los Santos started to leave the room, appellant stated, "I'm going to finish answering" the question De Los Santos had asked and continued talking on his own.  De Los Santos attempted to leave the room at several additional points, but appellant kept insisting that the interview continue.  Appellant then stated that he did not want to finish the interview that evening because he had been drinking beer and smoking marihuana, but he also staid that he wanted to continue in the morning, if possible.

De Los Santos agreed to take appellant home at that time.  He left the room to speak with his supervisors and then re-entered the room.  The interview continued, and appellant did not request to terminate it.  During the interview, De Los Santos told appellant that his friends, Artium Prov. and Anthony Brian Dankworth, were making statements to police in other rooms.  Because De Los Santos became concerned that appellant would alert other suspects about possible searches, De

3

Los Santos decided to place appellant under arrest. Appellant then asked for an attorney. In response, De Los Santos asked appellant to clarify if a request had been made. Appellant confirmed that he was requesting an attorney. The interview ended at that point, and De Los Santos left the room. The videotape, however, continued recording.

On May 21, 2002, appellant was charged by indictment with capital murder. *See* Tex. Penal Code Ann. § 19.03(a)(2). At a pretrial hearing, appellant argued that his incriminating statements made and recorded during the October 24 interview should be suppressed because he had invoked his right to counsel and his right to terminate the questioning.[2] The trial court overruled his motion to suppress. It also filed findings of fact and conclusions of law, in which it found that appellant did not invoke his right to terminate the interview or his right to an attorney before De Los Santos ceased talking with him. Thus, it denied the motion to suppress the videotape of the October 24 interview. At trial, the State offered an edited version of the videotape, which included only those statements made before De Los Santos decided to arrest appellant and statements made when appellant was left alone in the room. De Los Santos also testified about the interview.

In addition, the State offered the testimony of Jenny Vanrens, a friend of appellant, who testified that she had seen appellant on two occasions with a gun similar to the type used in Burns's homicide. She also testified about a telephone conversation she had with Dankworth two weeks before the homicide. She had been living in Wisconsin, and Dankworth was trying to convince her to move back to Austin. She told Dankworth she could not move because she did not have any money. Dankworth then told her that appellant had approached him with a plan concerning

---

[2] We will discuss the relevant portions of the videotape when we examine appellant's issues on appeal.

4

"a guy coming from out of town and they just—they had planned to rob him for the money and the drugs and they were splitting it and he would have cash pretty much." She stated that Dankworth told her that this robbery was to occur about two weeks after the conversation, and she identified the weekend that the homicide occurred.

John Paul Wile also testified. He shared a duplex with Artium Prov. and lived next door to appellant. Prov. and Wile also worked together at an Arby's restaurant. One day at work, Prov. took a telephone call. When he finished speaking on the phone, he approached Wile and "said something about there is going to be—him and Kevin[3] were going to jack[4] somebody that was coming to town with a bunch of money." Prov. thought that the robbery would yield $40,000 to $50,000. He then asked Wile to be the driver for them, but Wile declined. Wile further testified that he overheard Prov. speak about his plans several times over a couple of weeks. Although he had first spoken about the robbery as occurring in a hotel room, over time Pirov's plan changed and he had stated that the robbery would take place in a parking lot.

Wile also testified that at about 8:00 p.m. on the evening of the murder, Prov. wanted to take a nap and asked Wile to wake him up if appellant called. Appellant never called, and Wile left the duplex around 11:30 that evening. When he returned the next day, Prov. was angry at Wile for not waking him up. He complained that he could have made a lot of money that night if Wile had awakened him.

---

[3] Wile stated that he understood Pirov to be referring to appellant.

[4] Wile testified that "to jack" meant "to rob."

5

Corey Miller, who is a friend both of Burns and of appellant, testified that, about a week before Burns's death, appellant told him that Burns would be an easy target for a robbery. When Burns came to Austin and was looking to purchase marihuana, he contacted Miller, who then connected him to appellant. Miller also testified that appellant and Burns were supposed to meet between 8:00 and 10:00 in the evening to complete the transaction.

Javiel Ramirez, another friend of appellant, testified that appellant had discussed robbing Burns several months before the murder. Appellant knew when Burns was coming into town. He asked Ramirez to drive him to commit the robbery.

A jury found appellant guilty, and the trial court assessed punishment at life imprisonment. This appeal followed.

## DISCUSSION

In four issues, appellant argues that the trial court erred in failing to suppress incriminating statements he made on videotape while he was at the police station because he invoked his Fifth Amendment rights to counsel and to terminate the interview and in allowing witnesses to testify concerning hearsay statements as statements against interest. We will discuss each issue in turn.

### *Fifth Amendment Rights*

In his first and second issues, appellant argues that the trial court erred in failing to suppress incriminating statements he made on videotape during the questioning that occurred on October 24. First, he argues that questioning occurred after he invoked his right to counsel. Second, he argues that questioning occurred after he had invoked his right to terminate the interview. In

particular, he argues that the trial court erred in admitting De Los Santos's testimony concerning statements appellant made during the questioning on October 24 but that were not shown to the jury on the videotape. Finally, he argues that an incriminating statement he made while police officers were not in the room but that was captured on videotape would not have been made had De Los Santos ceased questioning him when he invoked his rights. He believes that these errors were constitutional and contributed to his conviction, and he therefore urges that we reverse the judgment of conviction and remand for a new trial.

We review a trial court's ruling on a motion to suppress for an abuse of discretion. *Long v. State*, 823 S.W.2d 259, 277 (Tex. Crim. App. 1991). The trial court is the sole and exclusive trier of fact and judge of the credibility of the witnesses as well as the weight to be given their testimony at a hearing on a motion to suppress. *Romero v. State*, 800 S.W.2d 539, 543 (Tex. Crim. App. 1990). On appeal, we do not engage in our own factual review, but we decide only whether the trial court's fact findings are supported by the record. *Id*.

We begin with appellant's second issue, in which he argues that questioning continued after he invoked his right to terminate the interview on October 24. Once warnings have been given, as happened in this case, the subsequent procedure to be applied during an interrogation is clear: if the individual indicates in any manner, at any time before or during questioning, that he wishes to remain silent, the interrogation must cease. *Miranda v. Arizona*, 384 U.S. at 474. At this point, he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. *Id*.

7

In this case, our review of the videotape does not support appellant's assertion that he sought to terminate the interview. In particular, appellant asserts that during questioning, he stated, "I'm done and I don't want to be involved." However, at this point in the questioning, appellant was responding to questions about how much he had to drink that day and how much marihuana he had smoked. He admitted to being "buzzed" and stated, "I made a conscious decision earlier [after the October 21 interview] and told all my friends I'm done and I don't want to be involved." He also indicated that he was speaking willingly at that point. We determine that appellant was only relating that he had decided before the questioning that he did not want to cooperate further but had changed his mind. The trial court appropriately determined that appellant did not indicate a desire to terminate the interview at that point.

Appellant also contends that no part of the videotape made after the point at which appellant was left alone in the interview room should have been played to the jury nor should De Los Santos have been allowed to testify about appellant's statements at trial because those statements were a direct result of the detective's failure to terminate the interview after appellant expressed his desire to do so. Appellant urges that illegally obtained evidence may not be admitted. Tex. Code Crim. Proc. Ann. art. 38.23 (West Supp. 2004-05); *Hernandez v. State*, 600 S.W.2d 793 (Tex. Crim. App. 1980). We have already concluded that the trial court correctly determined that appellant did not indicate a desire to terminate the interview at that point and therefore his Fifth Amendment rights were not violated. Accordingly, the complained-of evidence was not illegally obtained; consequently its admission was not barred under article 38.23. We overrule appellant's second issue.[5]

---

[5] Appellant argues that he also indicated his desire to terminate the interview at later points during the interrogation. When we review appellant's first issue, we will determine that he invoked

8

In his first issue, appellant argues that questioning continued after he invoked his right to counsel. When an accused has expressed his desire to deal with the police only through counsel, he is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police. *Edwards v. Arizona*, 451 U.S. 477, 487-88 (1981). "The right to counsel is considered invoked where a person indicates he or she desires to speak to an attorney or have an attorney present during questioning." *Lucas v. State*, 791 S.W.2d 35, 45 (Tex. Crim. App. 1989). An invocation must be clear and unambiguous; the mere mention of the words "attorney" or "lawyer" without more, does not automatically invoke the right to counsel. *Dinkins v. State*, 894 S.W.2d 330, 351 (Tex. Crim. App. 1995); *Robinson v. State*, 851 S.W.2d 216, 223 (Tex. Crim. App. 1991); *Collins v. State*, 727 S.W.2d 565, 568 (Tex. Crim. App. 1987). When reviewing alleged invocations of the right to counsel, we look at the totality of the circumstances surrounding the interrogation, as well as the alleged invocation, to determine whether a suspect's statement can be construed as an actual invocation of his right to counsel. *Dinkins*, 894 S.W.2d at 351. If the appellate record in a criminal case reveals constitutional error, we must reverse a judgment of conviction or punishment unless we determine beyond a reasonable doubt that the error did not contribute to the conviction or punishment. See Tex. R. App. P. 44.2(a); *McCarthy v. State*, 65 S.W.3d 47, 52 (Tex. Crim. App. 2001).

---

his right to counsel before he made any of those later statements. We note that each of those invocations of his right to terminate the interview occurred after he invoked his right to counsel and that the State voluntarily edited out all statements appellant made after he invoked his right to counsel before the video was introduced into evidence. Thus, we need not review them at this time.

9

When being asked where Dankworth was so that officers could pick him up for questioning, appellant stated, "I'm ready to go home. I need to talk to a lawyer and go home." At this point, De Los Santos had been questioning appellant for two hours. Although De Los Santos had told appellant that he was not in custody, he had read appellant his *Miranda* rights. The tone of the questioning had become increasingly aggressive. In addition, De Los Santos responded to appellant's statement by stopping the conversation, recognizing that appellant had invoked his right to counsel, and leaving the room to consult with his supervisor. Assuming that these circumstances indicate that appellant effectively invoked his right to counsel, we note that the State voluntarily edited the videotape and that the jury in this case did not view any statements made by appellant after this invocation except for the incriminating statement he made while left alone in the interrogation room. In addition, we have reviewed the videotape and De Los Santos's testimony at trial, and we find that De Los Santos did not testify to any statements made by appellant after he invoked his right to counsel. Thus, we must consider only if the admission of the incriminating statement he made while left alone in the interrogation room was error.

At the end of the interview, De Los Santos left appellant alone in the interview room while he prepared to take appellant home. De Los Santos had told appellant that Dankworth and Prov. had narrated the events of October 20 differently than he had. While alone in the room, but while the video equipment was still recording him, appellant stated:

> Now I am fucked, I am in jail regardless, can't believe Arty is saying this stuff, man. Please don't talk. I am gone. Do not fuck me, Bryan. Don't fuck me, Bryan. No physical evidence whatsoever, huhm, huhm, huhm, not one single strand of physical evidence. You can't prove nothing.

10

In general, article 38.22 of the code of criminal procedure governs the admissibility of oral statements and codifies the requirements of *Miranda*. *See* Tex. Code Crim. P. 38.22 (West 1979 & Supp. 2004-05). Statements which are not the result of or do not stem from custodial interrogation are admissible under Article 38.22 on the question of guilt. *Id.*, §§ 3, 5; *Chambliss v. State*, 647 S.W.2d 257, 261 (Tex. Crim. App. 1983). Custodial interrogation is questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way. *Miranda*, 384 U.S. at 444; *Burns v. State*, 807 S.W.2d 878, 882 (Tex. App.—Corpus Christi 1991, pet. ref'd). In this case, appellant's statements were made while he was alone in the room. No questioning was occurring; thus, the statements were not made as a result of custodial interrogation.

Appellant also contends that no part of the videotape made after the point at which appellant was left alone in the interview room should have been played to the jury nor should De Los Santos have been allowed to testify about appellant's statements during that time because those statements were a direct result of the detective's failure to terminate the interview after appellant invoked his right to counsel. Appellant urges that illegally obtained evidence may not be admitted. *See* Tex. Code Crim. Proc. Ann. art. 38.23 (West Supp. 2004-05); *Hernandez v. State*, 600 S.W.2d 793 (Tex. Crim. App. 1980). We have already concluded that the statement made while alone in the room was not the product of custodial interrogation and therefore his Fifth Amendment rights were not violated. Accordingly, the complained of evidence was not illegally obtained and its admission not barred under article 38.23. We overrule appellant's first issue.

*Statements Against Penal Interest*

In his third issue, appellant argues that the trial court erred in allowing Vanrens to testify about Danworth's statements to her concerning his plans to commit a robbery with appellant. In his fourth issue, appellant argues that the trial court erred in allowing Wile to testify about Pirov's hearsay statements concerning his plans to commit a robbery with appellant.

The trial court ruled that both instances of hearsay were admissible as statements against penal interest. S*ee* Tex. R. Evid. 803(24). The admissibility of an out-of-court statement under an exception to the general hearsay exclusion rule is within the trial court's discretion. *Zuliani v. State*, 97 S.W.3d 589, 595 (Tex. Crim. App. 2003); *Lawton v. State*, 913 S.W.2d 542, 553 (Tex. Crim. App. 1995). Therefore, a reviewing court should not reverse unless a clear abuse of discretion is shown. *Zuliani*, 97 S.W.3d at 595. An abuse of discretion occurs "only when the trial judge's decision was so clearly wrong as to lie outside that zone within which reasonable persons might disagree." *Cantu v. State*, 842 S.W.2d 667, 682 (Tex. Crim. App. 1992).

Hearsay is a statement, other than one made by the declarant while testifying at a trial or hearing, offered in evidence to prove the truth of the matter asserted. Tex. R. Evid. 801(d). For hearsay to be admissible, it must fit into an exception provided by a statute or the rules of evidence. Tex. R. Evid. 802. One such exception is Rule 803(24), which provides for the admissibility of a hearsay statement that "so far tended to subject the declarant to civil or criminal liability" at the time of its making "that a reasonable person in declarant's position would not have made the statement unless believing it to be true." Tex. R. Evid. 803(24). In criminal cases, this hearsay exception has

12

a second prong—"a statement tending to expose the declarant to criminal liability is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement." *Id*.

We begin with Vanrens's testimony about Dankworth's statements. As to the first prong of the 803(24) exception, appellant argues that Dankworth's statement in this case was made two weeks before the commission of the homicide. He asserts that rule 803(24) applies only to statements made after the commission of a crime and that are inculpatory as to that crime. *See, e.g.*, *Dewberry v. State*, 4 S.W.3d 735, 749-50, 753-54 (Tex. Crim. App. 1999). We agree that Dankworth's statements would not have subjected him to criminal liability at the time for capital murder. However, Dankworth had spoken about plans to commit the robbery, both with appellant and with Vanrens. Drivers had been solicited. The evidence showed that Dankworth and appellant had chosen Burns as a victim because he did not carry a gun and would have a large amount of cash. In addition, Dankworth had told Vanrens when the robbery would occur. Thus, evidence in the record establishes that Dankworth could be liable for *criminal conspiracy* at that time. *See* Tex. Pen. Code Ann. § 15.02 (West 2002). As a result, the trial court did not abuse its discretion by concluding that the first prong of the rule 803(24) test was satisfied.

As to the second prong—whether corroborating circumstances clearly indicate the trustworthiness of the statement—no definitive test exists by which to gauge the existence of corroborating circumstances for purposes of rule 803(24). *Davis v. State*, 872 S.W.2d 743, 749 (Tex. Crim. App. 1994). Many factors may be considered in this inquiry, including "whether the guilt of the declarant is inconsistent with the guilt of the accused, whether the declarant was so situated that he might have committed the crime, the timing of the declaration and its spontaneity, the relationship

13

between the declarant and the party to whom the declaration was made, and the existence of independent corroborating facts." *Id.* Further, we may consider evidence which undermines the reliability of the statement as well as evidence corroborating its trustworthiness, so long as we are careful not to engage in a weighing of the credibility of the in-court witness. *Id.* "The burden lies with the party seeking to admit the statement, and the test is not an easy one; the evidence of corroborating circumstances must clearly indicate trustworthiness." *Id.*

Dankworth's statements are corroborated by evidence admitted at trial. His description of the planned robbery matches appellant's behavior at the time the murder took place. For example, appellant left to meet Burns after 8:00 that evening, and Burns had come to Austin with a large amount of cash. In addition, Vanrens called Dankworth twice that evening and was not able to reach him. After the murder, Dankworth told one of his friends that he had taken $25,000 from someone. Dankworth's brother later gave that friend $25,000 in cash, asking him to hold the cash for him. Dankworth also paid off several loans. At the same time, appellant gave a $200 gift card and another $200 in cash to his friend Latrice McDuffie. He also signed nine money orders totaling $4,500. Finally, appellant's finger and palm prints were found on Burns's car. We find that the trial court could have relied on this evidence in determining that Dankworth's statements were corroborated. The trial court did not abuse its discretion by finding both prongs of rule 803(24). We overrule appellant's third issue.

Finally, we turn to Wile's testimony about Pirov's hearsay statements concerning his plans to commit a robbery with appellant. As to the first prong rule 803(24), Prov. had several conversations about a planned robbery, the plans changed over time, and he actively solicited Wile

14

as a driver. He could potentially be held liable for criminal conspiracy based on the evidence in the record. Turning to the corroborating evidence prong, we note that much of the evidence we reviewed corroborating Vanrens's testimony serves also to support Wile's. In addition, it appears that Wile and Prov. had a close relationship—they shared a duplex and worked together. We find that the trial court acted within its discretion in admitting Wile's testimony. We overrule appellant's fourth issue.

## CONCLUSION

Because we overrule all appellant's issues on appeal, we affirm the judgment of conviction.

_____

W. Kenneth Law, Chief Justice

Before Chief Justice Law, Justices Patterson and Puryear

Affirmed

Filed: March 10, 2005

Do Not Publish